**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808

**KALIELGOLD PLLC**
Sophia G. Gold (SBN: 307971)
sgold@kalielgold.com
950 Gilman Street, Suite 200
Berkeley, CA 94710
Telephone: (202) 350-4783

[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NATALIE TRISTAN, AVANTIKA AHUJA, and PHILLIP MYERS, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**BANK OF AMERICA, N.A.; and EARLY WARNING SERVICES, LLC D/B/A ZELLEPAY.COM,**<br><br>**Defendants.** | **Case No.:** 8:22-cv-01183-DOC-ADS Consolidated with Case No.: 2:22-cv-02313-DOC-ADS<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1) **BREACH OF CONTRACT;**<br>2) **VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT ("EFTA");**<br>3) **VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL");**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Natalie Tristan ("Tristan"), Avantika Ahuja ("Ahuja"), and Phillip Myers ("Myers") (together, the "Plaintiffs") bring this complaint, by and through their attorneys and on behalf of all others similarly situated, against Defendant Bank of America, N.A. ("Defendant," "Bank of America," "BOA," or the "Bank"), and allege as follows:

## INTRODUCTION

1.      The Zelle money transfer system is the "perfect weapon" for criminals, as summarized by U.S. Senator Elizabeth Warren.

2.      The Zelle money transfer system is rife with fraud—fraud that places all Zelle users at an acute and immediate risk. Billions of dollars of fraudulent transactions are processed by the service each year. Victims of Zelle fraud, like Plaintiffs, are often left devastated by such fraud, which can drain hundreds or thousands of dollars from their bank accounts.

3.      When Zelle fraud victims turn to Bank of America for help, the Bank has a simple, repeated, bad faith response: it is your fault, you are on your own, and we will not help—despite contractual promises by the Bank and marketing representations to the contrary.

4.      The Bank's corporate policy of "blaming the victim" is good business for the Bank. As a partial owner of non-party Early Warning Services, LLC d/b/a zellepay.com ("EWS"), the Bank, along with several other of America's largest banks, has a huge incentive to get as many of its customers as possible to sign up for and use Zelle for payments and money transfers: the more accountholders it can persuade to use the Zelle service, the more money the Bank saves by avoiding transaction payments to *other* payment networks. The Bank also generates revenue whenever its customers use Zelle to pay a business in exchange for goods and services. Accordingly, the Bank works with EWS to aggressively market the Zelle service to its accountholders, urging accountholders to sign up for Zelle every time they log in to online banking or use the Bank's mobile app.

5.     While EWS does not charge users for Zelle transactions, EWS does collect and share personal information from users with third parties, which is one of EWS's incentives to promote Zelle.

6.     The Bank markets Zelle as "safe," a narrative reinforced by the sign-up process, where the Zelle service is built into the Bank's website and mobile app.

7.     Unlike other commonly used consumer payment systems—credit cards, debit cards, even PayPal—***the Zelle service has no consumer fraud protections, money transfers are immediate and irrevocable, and the Bank will provide no help in the case of fraud***. These essential, material facts about Zelle are omitted from the marketing for a simple reason: no reasonable consumer would sign up for and use Zelle's service if these facts were fairly disclosed.

8.     The Bank fails victims of Zelle fraud in myriad ways.

9.     For victims of Zelle fraud who had their access devices (phones, cell phone numbers, computers, email addresses, or Bank/Zelle app login information) stolen and used by fraudsters, as was the case for Plaintiff Ahuja, the Bank maintains a massive bureaucratic apparatus designed to make it impossible for victims to lodge a successful fraud claim. When such victims make a claim for fraud, the Bank denies the claim without conducting a full investigation and blames fraud victims for the fraud. When those victims try to contact EWS to make a claim for fraud, EWS directs the victims back to the Bank.

10.    The consumer is left without recourse following the fraud or unauthorized transaction by a third-party.

11.    These policies and practices contradict the Bank's marketing promises and contract promises.

12.    The Bank's refusal to reimburse, investigate or provide provisional credit pending investigation of consumers' losses as a result of stolen access devices also violates the Electronic Fund Transfer Act ("EFTA"), a statute with the purpose of "provid[ing] a basic framework establishing the rights, liabilities, and

responsibilities of participants in electronic fund and remittance transfer systems."
15 U.S.C. § 1693(b). "The primary objective of [the EFTA] is the provision of
individual consumer rights." *Id.*

13.     These policies and practices also breach contractual promises the Bank made
and violate the duty of care owed by the Bank, as discussed in detail below.

14.     Plaintiffs seek actual damages, punitive damages, and an injunction on behalf
of the general public to prevent the Bank from continuing to engage in its illegal
and/or unfair practices as described herein.

### JURISDICTION AND VENUE

15.     The Court has original subject matter jurisdiction pursuant to 28 U.S.C.
§ 1331 because this case arises out of violations of federal law under the EFTA, 15
U.S.C. § 1693 *et seq*. Jurisdiction of this Court arises pursuant to 28 U.S.C. §§ 1331
and 1367 for supplemental jurisdiction over the California state law claims.

16.     The Court also has jurisdiction pursuant to the Class Action Fairness Act of
2005, 28 U.S.C. § 1332(d)(2), because (i) there is minimal diversity; (ii) Defendant
is not a government entity against whom the District Court may be foreclosed from
ordering relief; (iii) there are more than one hundred (100) people in the putative
classes; and (iv) the amount in controversy exceeds $5,000,000, exclusive of interest
and costs.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because: (1) Defendant
transacts business within this judicial district and because Plaintiffs Ahuja and
Tristan were and are, residents of Los Angeles County and Orange County,
California, respectively, at all times relevant to these claims such that a substantial
part of the events giving rise to Plaintiff Tristan's and Plaintiff Ahuja's causes of
action against Defendant arises in this judicial district; and (2) Defendant's contacts
with this District are sufficient to subject them to personal jurisdiction within this
judicial district for Plaintiffs' causes of action. Additionally, there is at least pendent
personal jurisdiction over Defendant for Plaintiff Myers's causes of action.

**PARTIES**

18.    Plaintiff Tristan is a natural person, individual citizen and resident of California, County of Orange, in this judicial district.

19.    Plaintiff Ahuja is a natural person, individual citizen and resident of California, County of Los Angeles, in this judicial district.

20.    Plaintiff Myers is a natural person, individual citizen and resident of Nevada, County of Clark.

21.    On information and belief, the Bank is a nationally-chartered bank with its principal place of business in Charlotte, North Carolina.

22.    On information and belief, non-party EWS is a limited liability company established under the laws of Delaware with its principal place of business in the State of Arizona.

23.    Zelle is an EWS-owned money payment platform ("MPP") that facilitates peer-to-peer ("P2P") instant payment services. EWS is owned by seven of America's largest banks, which includes Defendant Bank of America. On information and belief, EWS earns money for its owners and saves participating banks money by minimizing the fees the banks are charged for competitor P2P payment transactions.

**ZELLE – THE FAVORITE APP OF FRAUDSTERS**

24.    Created in 2017 by America's largest banks [1] to enable digital money transfers, Zelle comes embedded in banking apps and is now America's most widely used money transfer service, outpacing its closest rival (Venmo) by $260 billion in transfers in 2021. [2]

---

[1] Bank of America, Capital One, JPMorgan Chase, PNC Bank, BB&T (now Truist), U.S. Bank, and Wells Fargo.

[2] Stacy Cowley & Lananh Nguyen, *Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem*, N.Y. Times (Mar. 6, 2022), https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

25.     About 1.8 billion payments—totaling $490 billion—were sent by consumers and businesses through the Zelle Network in 2021, according to EWS.[3] Total dollars transferred were up 59% from 2020.[4]

26.     Nearly 18 million people have been victims of "widespread fraud" on money transfer apps, according to a letter sent in late April of 2022 to EWS by U.S. Senators Elizabeth Warren of Massachusetts, Robert Menendez of New Jersey, and Jack Reed of Rhode Island.[5]

27.     "Zelle's biggest draw—the immediacy of its transfers—also makes scams more effective and 'a favorite of fraudsters,' as consumers have no option to cancel a transaction even moments after authorizing it," according to the above letter.[6]

28.     The 1,700 banks and credit unions who are members of the Zelle network, including the Bank, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take steps to warn their accountholders of these risks—or to protect their accountholders who fall prey to fraud.

29.     The rampant Zelle fraud is only escalating, according to an October 2022 Senate report. Data provided by several banks revealed the rapidly increasing extent of fraud on the platform. Four banks reported they had received scam and fraud claims in excess of $90 million in 2020 and were on pace to receive scam and fraud claims in excess of $255 million in 2022.[7]

---

[3] *Nearly Half a Trillion Dollars Sent by Consumers and Businesses with Zelle in 2021*, ZellePay.com (Feb. 2, 2022), https://www.zellepay.com/press-releases/nearly-half-trillion-dollars-sent-consumers-and-businesses-zelle-2021.

[4] *Id.*

[5] Letter from Elizabeth Warren, Robert Menendez, Jack Reed, Sen., U.S. Cong., to Al Ko, CEO, Early Warning Services, LLC (Apr. 29, 2022), https://www.warren.senate.gov/imo/media/doc/2022.04.29%20Letter%20to%20Early%20Warning%20Systems%20LLC.pdf.

[6] *Id.*

[7] *Facilitating Fraud: How Consumers Defrauded on Zelle are Left High and Dry by the Banks that Created It* at 1, Off. of Sen. Elizabeth Warren (Oct. 2022),

30. For the Bank, the number of Zelle fraud and scam claims more than doubled between 2020 and 2021, from 49,652 claims in 2021 to 131,509 claims in 2021.[8]

31. Nowhere in the Bank's marketing does it warn potential Zelle users of the risks of being scammed by persons impersonating their banks. Consumers are not aware that money transfer transactions with Zelle differ from other similar platforms.

32. In short, and unbeknownst to average Zelle users, the Zelle network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists, landlord impersonators, and those who use social media sites to advertise fake concert tickets, used cars, and purebred puppies—or simply for those who steal phones, computers, cell phone numbers, email addresses, or user data and then use their access to drain money from accounts via Zelle.

33. Fraudsters and scammers have turned to Zelle as their favorite service because transfers are immediate and unrecoverable. There is an additional design feature of Zelle that makes it a fraudster's favorite: one can become a Zelle user and recipient without revealing their true identity to the other person.

34. Led by Idaho Attorney General Lawrence Wasden and Oregon Attorney General Ellen Rosenblum, a bipartisan coalition of thirty-three (33) attorneys general wrote the Consumer Financial Consumer Protection Bureau ("CFPB"), calling for stronger consumer safeguards for money sharing platforms and apps like Zelle.[9] The letter, written in response to the CFPB's request for comments on its inquiry into "Big Tech Payment Platforms," noted a rise in complaints against popular payment apps including Zelle. The letter highlighted that: "[m]any

---

https://www.warren.senate.gov/imo/media/doc/ZELLE%20REPORT%20OCTOBER%202022.pdf.

[8] *Id*. at 4.

[9] Letter from Ellen F. Rosenblum, Oregon Attorney General, and Lawrence Wasden, Idaho Attorney General to Rohit Chopra, Director, CFPB (Dec. 20, 2021), https://www.doj.state.or.us/wp-content/uploads/2021/12/State-Attorneys-General-Comment-on-CFPBs-Inquiry-into-Big-Tech-Payment-Platforms-2021.pdf.

consumers have been scammed out of hundreds or thousands of dollars by other users of these payment platforms [like Zelle]. ***Scammers are attracted to real-time payment platforms, in large part, because they do not need to reveal their true identity to set up an account***."[10]

35.    As a result, crooks are using Zelle to rob consumers when listing fake puppies to sell, advertising phony apartments or homes to rent, threatening utility service cut-off without immediate transfer of money, or offering extra income for wrapping a personal car in an advertisement.

36.    A common version of the utility scam involves fraudsters, posing as utility company employees, initially contacting customers via text message, then by phone call and asking them to make missed payments via a website.

37.    According to a June 2022 alert by the Better Business Bureau ("BBB"), another common scam involves a prospective buyer supposedly wanting to buy an item listed on Facebook Marketplace but then claiming that the seller needs to upgrade their Zelle app to accept money from their "business account" for the big-ticket purchase to go through. The scammer then puts up $300, sends the seller screenshots of their Zelle app as proof, and pressures the seller into paying them back.[11]

38.    "'Scammers go where it's easy to get the money. Zelle is their current mechanism to drain consumer accounts,'" warned Ed Mierzwinski, [Public Interest Research Group ("PIRG")] Education Fund's senior director of federal consumer programs. 'The scammers are taking advantage of consumers because the banks are letting them,' Mierzwinski said[.]"[12]

---

[10] *Id.* at 2 (emphasis added).

[11] *BBB Scam Alert: Crafty new scam targeting Facebook Marketplace sellers*, BBB (June 24, 2022), https://www.bbb.org/article/scams/27212-scam-alert-how-to-spot-shady-buyers-on-facebook-marketplace.

[12] Susan Tompor, *DTE impersonators drained Rochester Hills woman's checking account using Zelle app*, Detroit Free Press (July 1, 2022, 5:04 PM),

39.    The fraud risk is so acute and immediate that PIRG recommends consumers maintain a separate bank account to link to Zelle accounts if they decide to use Zelle.

40.    Scams like these are rampant on the Zelle network precisely because of the design and architecture of the network, specifically because money transfers are instantaneous and unrecoverable.

41.    The unique and undisclosed architecture of the Zelle payment system, the financial relationship between the Bank and EWS, and the Bank's own policies specific to Zelle transactions means that—unlike other payment options commonly used by American consumers—virtually any money transferred for any reason via Zelle is gone forever, without recourse, or reimbursement protection for victimized accountholders.

42.    The Bank did nothing to stop the problem or sufficiently warn users of the problem prior to the lawsuits filed by Plaintiffs because of the Bank's financial interests and for fear of suppressing new users as well as use of the service by existing users.

43.    After these lawsuits, the Bank reportedly began providing warnings to its accountholders regarding the risks of using Zelle's services and regarding common scams. Notably, the Bank failed to provide these warnings in its Zelle marketing, much less prior to each Zelle transfer, before these lawsuits were initiated.

44.    Moreover, the Bank's warnings are still inadequate to protect consumers, in part because the Bank failed to provide these disclosures before a consumer signs up for Zelle.

45.    As of June 2023, the Bank reportedly began reversing transfers for certain customers and is required by EWS to implement a tool that flags risky transfers[13],

---

https://www.freep.com/story/money/personal-finance/susan-tompor/2022/06/30/utility-shutoff-scam-stole-cash-via-zelle/7714138001/.

[13] Hannah Lang, *Payments app Zelle begins refunds for imposter scams after Washington pressure*, Reuters (Nov. 13, 2023, 10:05 AM), https://www.reuters.com/technology/cybersecurity/payments-app-zelle-begins-

but the Bank never offered this option to Plaintiffs, and none of the Plaintiffs have been reimbursed by the Bank.

### THE ZELLE SIGN-UP PROCESS LURES ACCOUNTHOLDERS TO SIGN UP FOR AND USE ZELLE

46.     It is free to sign up with Zelle, and Zelle is integrated into the Bank's websites and mobile app.[14]

47.     There is no way for an accountholder to disable or remove Zelle from the Bank's website or mobile app.

48.     Accountholders sign up for Zelle after they have already become BOA acountholders—often, years later.

49.     Signing up for Zelle involves providing the Bank and EWS with a reliable email or cell phone number, and clicking or swiping through a series of screens. The email or cell phone number consumers use to enroll with Zelle is subsequently used as a token to authenticate a user's identity when they attempt to transfer funds through the Zelle service.

50.     Zelle requires that users designate and link a single email or cell phone number to a bank account. If a user previously enrolled Zelle at a different bank, the email or cell phone number must be removed from that account before it can be used to re-enroll.

51.     During the Zelle sign-up process, users are not affirmatively provided with agreements or disclosures previously provided at the time they opened their Bank of America account.

---

refunds-imposter-scams-after-washington-pressure-2023-11-13/#:~:text=Payments%20app%20Zelle%20begins%20refunds%20for%20imposter%20scams%20after%20Washington%20pressure,-By%20Hannah%20Lang&text=Nov%2013%20(Reuters)%20%2D%20Banks,in%20a%20major%20policy%20change.

[14] *See*, *e.g.*, Ex. 1 at 5 (side by side logos featuring "Bank of America together with Zelle").

52. Funds are not available to Zelle users without enrollment.

53. The Bank's mobile app and online banking website feature numerous invitations and advertisements to sign up for the Zelle service. On information and belief, such marketing is jointly designed and promulgated by the Bank and EWS. EWS requires its partner banks to integrate the Zelle platform into banks' online and mobile banking platforms using specific user experience designs and similar promotional language, such as references to Zelle being fast, easy, and *safe*.[15]

54. In its marketing of Zelle and during the Zelle signup process within the Bank's mobile app and website, the Bank makes repeated promises that Zelle is a "fast, **safe** and easy way to send and receive money." (emphasis added).

55. It also promises: "Move money in the moment. It's simple and **secure** – with lots of people you know" (emphasis added).

56. As initially rolled out to consumers in 2017, the Bank's website featured a page devoted to explaining and marketing Zelle. That page directed consumers to the Zelle sign-up process and expressly stated: "**You are not liable for fraudulent Online and Mobile Banking transactions** when you notify the bank within 60 days of the transaction first appearing on your statement and comply with security responsibilities."[16]

57. This and similar promises were made both in public-facing marketing and in sign-up for accountholders.

58. The Zelle FAQs available on the Bank website in 2018, reiterated those promises:

> **What is Zelle®?**
>
> …
>
> **Is it secure?**

---

[15] BOFA-ZELLE-TRISTAN_00015618–41, at 00015618–21.
[16] Ex. 2 at 12 (emphasis added); Ex. 3 at 10 (emphasis added).

Yes, with our Bank of America Mobile Banking Security Guarantee, you are protected by the same security you're used to where **you will not be liable for fraudulent transactions (when reported promptly)** and we will help keep your information safe.[17]

59.   Another of the Bank's Zelle marketing website pages urged consumers to download the Bank's mobile app and send money with Zelle promising: "It's secure: As always, you are not responsible for transactions you didn't authorize."[18]

60.   Each Plaintiff relied upon a promise that they would not be responsible for transactions they did not authorize.

61.   These provisions were reasonably understood by Plaintiffs to mean that Plaintiffs would not be liable for electronic fund transfers effectuated as a result of fraud.

62.   Plaintiffs' understanding was per se reasonable because, as discussed *infra* paragraph 96, the Bank itself understands "unauthorized transactions" to "include . . . fraud."[19]

63.   At no time prior to the fraudulent losses incurred by Plaintiffs and Class Members did the Bank's marketing or sign-up disclosures warn Plaintiffs and Class Members of the true security risks associated with using the Zelle service—including the immediate and acute risk of fraud, the dangerous architecture of Zelle's system, and the risk that fraudulent losses would never be reimbursed by the Bank.

### Zelle Marketing

64.   Zelle was introduced to the American public with a massive advertising blitz starting in 2017. The Bank and other partner banks marketed Zelle as a safer alternative to other instant payment services because "it's backed by the banks."[20]

---

[17] Ex. 1 at 5–6 (emphasis added).

[18] Ex. 4 at 2.

[19] Ex. 5 at 42.

[20] Stacy Cowley, *Zelle, the Banks' Answer to Venmo, Proves Vulnerable to Fraud*, N.Y. Times (Apr. 22, 2018), https://www.nytimes.com/2018/04/22/business/zelle-banks-fraud.html.

65.     Marketing for Zelle is jointly controlled and promulgated by EWS and partner banks. The advertisements exploit accountholders' existing trust in their financial institutions by reinforcing that Zelle is integrated with accountholders' trusted bank-backed mobile app: "We do our own campaigns and we also work closely with banks and credit unions to give them materials and messaging to reach their customers," stated Melissa Lowry, Vice-President of Marketing and Branding at EWS.[21] "*People can hear about Zelle from their banks and credit unions that they already know and trust*."[22]

66.     The Bank leveraged its consumers' trust as an existing financial institution to attract users: "'Trust is at the heart of the consumer payment relationship,' said Ravi Loganathan, Head of Business Intelligence at [EWS]. 'Our research showed that new segments of consumers engaged in a P2P payment for the first time because it was offered from their known and trusted mobile banking environment[.]'"[23]

67.     Whether the consumer wants it or not, Zelle comes integrated with the Bank's mobile app and online banking website, unlike other P2P payment apps, such as Venmo or Paypal, which require downloading a third-party app.

68.     The manner in which Zelle is embedded in the Bank's mobile app and website deceives consumers into perceiving that Zelle is an extension of the traditional banking services offered by the Bank: "'In our research, we learned that people who are peer-to-peer [money transfer] skeptics are those resistant to using something outside traditional banking,' said Rose Corvo, Chief Adminsitrative Officer for [EWS][.] 'The fact that they have it in their banking app—that gets through the

---

[21] Zack Miler, *Zelle's Melissa Lowery: 'Beyond awareness, we're trying to show how we make everday better*,*' Tearsheet (Mar. 21, 2019), https://tearsheet.co/podcasts/zelles-melissa-lowry-beyond-awareness-were-trying-to-show-how-we-make-everyday-better.

[22] *Id.* (emphasis added).

[23] *See Zelle Study Finds Growing Use of Digital Payments Across Generations*, ZellePay.com (July 11, 2018), https://www.zellepay.com/press-releases/zelle-study-finds-growing-use-of-digital-payments-across-generations.

safety barriers in mind.'"[24] The Bank exploited this trust relationship to promote Zelle.[25]

69.     The Bank touts Zelle to accountholders as a secure, free, and convenient way to make money transfers. However, the marketing (including during the sign-up process) misrepresents and omits a key fact about the service: there is virtually no recourse for consumers to recoup losses due to fraud. Indeed, unlike virtually every other payment method commonly used by American consumers—debit cards, credit cards, and even PayPal—there is no protection for accountholders who are victims of fraud, and virtually no recourse for accountholders or Zelle users attempting to recoup losses due to fraud.

70.     The unique and undisclosed architecture of the Zelle payment system means that—again, unlike other payment options commonly used by American consumers—virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement, or protection. This too is omitted from all marketing and Zelle sign-up materials.

71.     Worse yet, the Bank misrepresents and omits the truth about a practice it has adopted: it does not and will not reimburse its accountholders for losses when users are tricked into making Zelle transfers due to fraud, and will almost never reimburse accountholders for losses when their access devices are stolen and their Zelle accounts are preyed upon by fraudsters—even where those losses are timely reported by accountholders.

72.     The Bank was required to accurately represent the unique features of the Zelle service in its marketing about it and in contractual representations. But the Bank failed to do so.

---

[24] *Zelle Takes To The Airwaves To Attract Users*, PYMNTS (Jan. 16, 2018), https://www.pymnts.com/news/payment-methods/2018/zelle-takes-to-the-airwaves-to-attract-users/.

[25] *See, e.g.*, Ex. 1 at 5 (side by side logos featuring "Bank of America together with Zelle").

73.     As a result, users like Plaintiffs signed up for and used the Zelle service without the benefit of accurate information and protections regarding that service. Such users later ended up with huge, unreimbursed losses due to fraud. Such users never would have signed up for Zelle had they known the risks of using the service.

74.     The acute and immediate risks described above are well known to the Bank but were omitted from Zelle marketing to Plaintiffs and the Class Members.

75.     On information and belief, the Bank uses Zelle, a service of EWS, to insulate itself from financial liability for fraudulent and unauthorized transactions.

### IN VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT ("EFTA"), 15 U.S.C. § 1693 ET SEQ., THE BANK HAS IGNORED REGULATORY GUIDANCE

76.     EFTA is a remedial statute and reflects a congressional policy determination about who should bear the loss for unauthorized electronic fund transfers. Its primary objective is "the protection of individual consumers engaging in electronic fund transfers ["EFTs"] and remittance transfers." 12 C.F.R. § 1005.1(b).

77.     EFTA and its implementing regulation, Regulation E, apply to "financial institutions," which include the Bank, 12 C.F.R. § 1005.2(i).

78.     "EFTs" include payments made with the Zelle payment service, an interpretation consistent with guidance of the CFPB[26] and FDIC.[27]

79.     EFTA and Regulation E trigger three key obligations of financial instiutions: (1) provisional credit pending investigation; (2) investigation; and (3) error resolution/reimbursement, each actionable as stand-alone statutory claims. *See* 15 U.S.C. § 1693m(a) (imposing liability for a violation of any subsection of §1693).

***The Bank Failed to Provisionally Credit Plaintiffs Ahuja and Myers***

---

[26]*Electronic Fund Transfers FAQs*, CFPB (Dec. 13, 2021) https://files.consumerfinance.gov/f/documents/cfbp_electronic-fund-transfers-faqs.pdf.

[27] *Consumer Compliance Supervisory Highlights* at 5, FDIC (Mar. 2022), https://www.fdic.gov/regulations/examinations/consumer-compliance-supervisory-highlights/documents/ccs-highlights-march2022.pdf.

80.     Upon notice from the consumer, financial institutions must investigate alleged errors and notify consumers of their determinations within ten (10) business days. 15 U.S.C. § 1693f(a).

81.     If a financial institution provisionally recredits the consumer's account, then the financial institution has forty-five (45) days to investigate. *Id.* § 1693f(c).

82.     The Bank did not provisionally credit Plaintiffs Ahuja and Myers pending its investigation, so the Bank was afforded only ten (10) days, not forty-five (45) days, to investigate.

83.     Plaintiff Myers reported his claim to the Bank on April 26, 2022.

84.     On May 3, 2022, over the phone, the Bank's customer service representative issued a Claim Denial as follows:

> We have completed our investigation of your claim. Our records indicate that we initiated the transfer in accordance with your instruction, therefore no error occurred. Based on this, your account will not be credited. However, as a courtesy, we are researching your inquiry and will notify you if we need additional information. Keep in mind it may take up to 45 calendar days.[28]

85.     The Bank recited the same content in a form letter issued to Plaintiff Tristan.[29]

86.     Thereafter, but within forty-five (45) days from the initial notice, the Bank continued its investigation of Plaintiff Myers' claim.[30]

87.     The Bank did not provisionally credit Plaintiff Myers' account.[31]

88.     On information and belief, the Bank routinely employs this strategy of issuing a denial within ten (10) days, while reserving the right to further investigate within forty-five (45) days, as a work-around for EFTA's requirement to provisionally credit consumers' accounts while it carries out its investigation.

89.     Plaintiff Ahuja reported her claim to the Bank on February 7, 2022.

---

[28] BOFA-ZELLE-TRISTAN_00015880 at 00015881.
[29] BOFA-ZELLE-TRISTAN_00015891.
[30] BOFA-ZELLE-TRISTAN_00015880 at 00015881.
[31] *Id.*

90.     On February 18, 2022, the Bank denied Plaintiff Ahuja's claim, informing her that it had "completed our research" and consider "this claim closed."[32]

91.     The Bank did not provisionally credit Plaintiff Ahuja's account.[33]

92.     On information and belief, the Bank routinely fails to provisionally credit accountholders for transactions involving the Zelle service.

***The Bank Failed to Provide a Written Explanation of its Investigation Results within Ten (10) Days to Plaintiff Myers***

93.     While the Bank notified Plaintiff Myers his claim was denied over the phone, the Bank did not provide a written explanation of its investigation findings to Plaintiff Myers within ten (10) days of receiving notice of his dispute.

94.     The only written notice the Bank provided to Plaintiff Myers was on May 19, 2022, after the 10-day window that began on April 26, 2022, had elapsed.

***The Bank's Investigation was Conclusory and Insufficient***

95.     When investigating a consumer's claim of error, which includes unauthorized transfers, 15 U.S.C. § 1693f(f),[34] "the financial institution *must* review any relevant information within the institution's own records for the particular account to resolve the consumer's claims." 12 C.F.R. § 1005, Supp. I at 11(c)(4) (emphasis added).

96.     Plaintiff Ahuja and Plaintiff Myers provided specific information to the Bank regarding the unauthorized EFT.

97.     Plaintiff Ahuja provided the Bank with a copy of the police report that described how her phone had been misplaced and was out of her possession, and the Zelle EFT transactions that had been initiated by a third party from the phone when

---

[32] BOFA-ZELLE-TRISTAN_00015871 at 00015873.

[33] *Id*.

[34] "[U]nauthorized EFT" includes "a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery," as was the case for both Plaintiff Ahuja and Tristan. *See* Comment to § 1005.2(m)–3 of Regulation E, CFPB, https://www.consumerfinance.gov/rules-policy/regulations/1005/interp-2/#2-h-Interp-3 (last visited Nov. 17, 2023).

---

it was not in her possession, as well as follow-up blackmail communications from the fraudster.

98.    Plaintiff Myers provided the Bank with information concerning the fraudulent credit card charge that led to Plaintiff Myers' phone call with a fraudster, who guided him to download a phone app with the ostensible purpose of helping Plaintiff Myers, but in reality was the channel for the fraudster to "mirror" Plaintiff Myers' phone to view Plaintiff Myers' phone and over the phone trick Plaintiff Myers into initiating five separate unauthorized EFT transactions through Zelle.

99.    The Bank received notice from Plaintiff Ahuja of the facts and circumstances of the disputed transactions.

100.   The Bank received notice from Plaintiff Myers of the facts and circumstances of the disputed transactions.

101.   The Bank failed to adequately investigate the claims of Plaintiff Ahuja and Plaintiff Myers.

102.   The Bank ignored or failed to meaningfully consider Plaintiffs Ahuja and Plaintiff Myers' transaction histories for a reasonable period of time immediately preceding their claims for consistency with prior transaction history, e.g., whether they had previously sent EFTs to the same recipient in similar sums.

103.   For Plaintiff Myers, for example, during the three months prior to the unauthorized Zelle transfers, he had only sent three Zelle transfers from his Bank of America account, all to his wife, Diane Myers, and none occurring on the same day.[35]

104.   Meanwhile, all five unauthorized transactions for Plaintiff Myers were sent to a recipient without a full name, with whom Plaintiff Myers had no transaction or payment history with, and they were all sent within a matter of hours.[36]

---

[35] BOFA-ZELLE-TRISTAN_00016487–7114, at 00017025–52.
[36] *Id.* at BOFA-ZELLE-TRISTAN_00017050 and 00015882.

105.   For Plaintiff Ahuja, account statements show that she had never transferred money via Zelle or any other means to "Jiana Basconcillo."[37]

106.   The two transfers totaling $3,500, both to the same recipient, were by far the largest Zelle transfers to the same receeipient ever posted to Plaintiff Ahuja's account.

107.   The Bank knew the account number and account name of the recipient of the funds that were transferred from Plaintiff Ahuja's account.

108.   The Bank knew the account number and account name of the recipient of the funds that were transferred from Plaintiff Myers' account.

109.   The Bank only reviewed payment instructions for Plaintiff Ahuja's disputed transaction.

110.   The Bank only reviewed payment instructions for Plaintiff Myers' disputed transaction.

111.   Rather than analyzing the specific facts provided by Plaintiff Myers and Plaintiff Ahuja, and although the Bank on its own or with assistance from EWS knew the account number and recipient of the unauthorized funds, the Bank limited its investigation to review of payment instructions, which is improper. 12 C.F.R. § 1005, Supp. I at 11(c)(4) ("may not limit its investigation solely to the payment instructions where additional information within its own records pertaining to the particular account in question could help to resolve a consumer's claim").

112.   Neither Plaintiff Ahuja nor Plaintiff Myers had previously sent funds via Zelle to the recipient, sent multiple Zelle transfers to the same person in a single day, or sent such large sums of money. These factors—along with information about the identity or account history of the recipient of the funds (which is information not available to Plaintiffs)—should have alerted the Bank that the transactions were unauthorized.

113.   On information and belief, EWS screens transactions for fraud, including those at issue by Plaintiffs Ahuja's and Myers' claims, by gathering information

---

[37] BOFA-ZELLE-TRISTAN_00015917–6310, at 00016183.

from both the sender and recipient. EWS passes along or makes this information available to the Bank. When claims are not flagged as fraudulent by EWS, the Bank summarily denies them.

114. Here, for Plaintiff Ahuja, the Bank erroneously concluded that the unauthorized EFTs were (i) "completed using a device that is consistent with previous valid account activity"; (ii) "validated using an authentication code sent to a valid phone number belonging to a signer on the account"; and (iii) "confirmed valid by you via (SMS/MMS) text message response or speaking directly with Fraud Detection employee," or made substantially similar conclusions reflected in written correspondence.[38]

115. For Plaintiff Myers, the Bank's denial letter opaquely states the Bank "completed the transfer(s) according to the instructions you provided us."[39]

116. The Bank's boilerplate denial letters fail to explain the review the Bank conducted of its own records, including the specific records the Bank reviewed and how these specific records supported the Bank's "authorized" conclusion.

117. The Bank's boilerplate denial letters fail to explain whether the Bank, in reviewing its own records, considered: the sum of each electronic fund transfer, the receipient of each electronic fund transfer, the number of electronic fund transfers processed in one day, and whether the Plaintiff had previously transferred money to that receipient.

118. The Bank's investigation ignored that Plaintiffs Ahuja and Myers stated they did not authorize the Zelle EFT transactions, which were the result of fraud, hack software, or stolen access devices by third parties.

119. The Bank's boilerplate denial letters flip the burden of proof onto consumers to *disprove* the supposed reasonableness of the Bank's investigation. But EFTA puts

---

[38] BOFA-ZELLE-TRISTAN_00015894–901, at 00015898.
[39] BOFA-ZELLE-TRISTAN_00015909.

the burden of proof on financial institutions to show that disputed EFTs were authorized.15 U.S.C. § 1693g(b).

***The Bank failed to comply with its error resolution obligations and did not reimburse Plaintiffs for the unauthorized transfers***

120.   When EFTs are unauthorized, consumers' liability for the unauthorized transactions is limited to $50.00. 15 U.S.C. § 1693g(a).

121.   Consumer negligence plays no role in determining the consumer's maximum liability. For example, if a consumer wrote their pin number on a debit card which was used by a third party to initiate an unauthorized transaction, the Bank would still have an error resolution obligation to reimburse the consumer. Comment to 12 C.F.R. § 1005.6(b) - 2

122.   In violation of its "error resolution" obligation under 12 C.F.R. § 1005.11, the Bank did not reimburse Plaintiffs Ahuja and Myers for losses from unauthorized EFTs.

123.   On information and belief, at the time of Plaintiffs' losses, the Bank, because of its financial interests, rarely, if ever, reimbursed consumers harmed by the unauthorized Zelle EFTs initiated by third-parties.

124.   Beginning with intake and continuing through reimbursement policies, the Bank's practices differ for Zelle EFTs as compared to other EFTs, such as ACH bank-to-bank transactions.

### BANK OF AMERICA BREACHED CONTRACT PROMISES AND THE IMPLIED COVENANT

125.   The Bank's Deposit Agreement & Disclosures ("the Agreement"), applicable to consumer accounts, states:

**What Are Problems and Unauthorized Transactions**

Problems and **unauthorized transactions include suspected fraud**; missing deposits; **unauthorized electronic transfers**; missing, stolen, or unauthorized checks or other withdrawal orders; checks or other

withdrawal orders bearing an unauthorized signature, endorsement or alteration; illegible images; encoding errors made by you or us; and counterfeit checks. This is not a complete list.[40]

126.   The Agreement also includes the Online Banking Service Agreement, which states:

**You will have no liability for unauthorized transactions** if you notify us within 60 days after the statement showing the transaction has been mailed to you (or 90 days if the transaction was from an account maintained at another financial institution). . . . If a good reason (such as a long trip or hospital stay) kept you from telling us, we may extend the time periods.[41]

127.   Plaintiffs' losses from using Zelle should have been covered by this fraud protection promise because all were the victims of "suspected fraud" and, thus "unauthorized transactions."

128.   These provisions were reasonably understood by Plaintiffs to mean that Plaintiffs would not be liable for EFTs effectuated as a result of fraud.

129.   As alleged with specificity herein, Bank of America misrepresented fraud protections in the Agreement. Bank of America adopted an unreasonable and unfair understanding of the Agreement's term "unauthorized."

130.   The term "unauthorized" reasonably encompasses all transactions occurring as a result of fraud or even "*suspected* fraud."[42]

131.   More recently, and likely as a result of this litigation, the Bank has for the first time made an express distinction between "fraudulent" transactions and "unauthorized payments," though its definition contradictorily includes "unauthorized payments" as a type of "fraud":

Fraud, for example:

i.   *Unauthorized* Payments that occur in instances of account takeover,

---

[40] Ex. 5 at 42.

[41] Ex. 6 at 18 (emphasis added); Ex. 7 at 18 (emphasis added).

[42] Ex. 5 at 42 (emphasis added) ("[p]roblems and unauthorized transactions include suspected fraud").

lost/stolen debit cards or account information, etc.;

    ii.   Scams - Recipient convinces a Sender to send money with Zelle by (i). pretending to be or to represent another person or entity; or (ii). offering to provide a good, service, or additional funds while intending to provide nothing in return.[43]

132.   Prior disclosures made no such distinction.

133.   In sum, the Bank unfairly and improperly considers fraudulent Zelle transactions to be "authorized," thus shirking fraud protection promises it otherwise makes in the Agreement.

134.   Moreover, and with respect to users like Plaintiff Ahuja, whose access device was taken by a third party without permission and then used by the fraudster for fraudulent transactions, the Bank has adopted an investigation practice that almost always rejects valid claims, in breach of the implied covenant of good faith and fair dealing.

### PLAINTIFF TRISTAN'S FACTUAL ALLEGATIONS

135.   Plaintiff Tristan opened an account with the Bank on March 10, 2020.

136.   When Plaintiff Tristan signed up for Zelle, she was not informed that Zelle's service had a significant "catch" and that significant monetary losses could result from signing up for the service—or that those losses almost never are reimbursed by the Bank.

137.   For example, on November 22, 2021, a fraudster transferred $2,150 from Plaintiff Tristan's personal bank accounts using the Zelle service.

138.   Plaintiff Tristan is a young college student who was searching for rental apartments online.

139.   In November 2021, Plaintiff Tristan was searching for rental apartments and believed she found a potential unit to lease online from a fraudster who went by the name of "Orlin Aguilera."

---

[43] Ex. 8 at 8 (emphasis added).

140.   Plaintiff Tristan was interested in the purported rental unit and began communicating with the fraudster who informed her to submit a rental application and fees to be screened for approval as a tenant.

141.   As the fraudster requested, Plaintiff Tristan transferred $150 via Zelle for application fees. Shortly thereafter, the fraudster informed Plaintiff Tristan that her application was "approved," and to finalize obtaining the apartment, she also needed to transfer via Zelle the security deposit of $800 and first-month's rent of $1,200. Eager to secure the rental, and following the instruction of the fraudster, Plaintiff Tristan used Zelle to transfer an additional $2,000 to the fraudster.

142.   Afterwards, Plaintiff Tristan and the fraudster coordinated a time for her to move-in and collect the keys. However, when Plaintiff Tristan arrived at the apartment, the fraudster was nowhere to be found. The fraudster repeatedly called Plaintiff Tristan with excuses for his tardiness and reassured Plaintiff that he would be arriving promptly with the keys, but he never showed.

143.   At this point, Plaintiff Tristan determined she had been a victim of fraud and demanded her money be returned. Despite Plaintiff Tristan's demand, the fraudster did not return the money and ceased all communications with Plaintiff.

144.   Plaintiff Tristan timely informed the Bank of the fraud, but the Bank refused to reimburse her for the losses.

145.   Specifically, on November 22, 2021, Plaintiff Tristan immediately notified the Bank once she realized the fraud. Initially, the Bank informed Plaintiff Tristan that she would be protected from the fraud and should expect a full reimbursement of the funds. Ultimately, however, the Bank denied the claim and refused to reimburse Plaintiff her loss.

146.   On November 30, 2021, in a letter the Bank stated "Our records indicate that we completed the transfer(s) according to the instructions you provided us, and therefore no error occurred. Based on this, your account won't be credited."[44]

---

[44] BOFA-ZELLE-TRISTAN_00015891.

147.   This boilerplate Claim Denial letter failed to explain how the Bank confirmed that the transfer posted to the account as Plaintiff Tristan requested. Instead, the letter opaquely states the Bank "completed the transfer(s) according to the instructions you provided us."

148.   Additionally, the Bank's boilerplate letter did not identify the specific records in the Bank's possession that it reviewed in denying Plaintiff Tristan's claim. There is no reference to the Bank reviewing Plaintiff Tristan's monthly account statements or prior Zelle transactions. And to the extent the Bank reviewed such records, the Bank failed to explain how these records support its conclusion that Plaintiff Tristan approved the transaction.

149.   Again, on December 7, 2021, the Bank sent Plaintiff Tristan a substantially similar boilerplate denial letter.

150.   On information and belief, the Bank and EWS share information about fraudulent and unauthorized transactions, and EWS was already on notice of Plaintiff Tristan's claim based on information provided by the Bank.

## PLAINTIFF AHUJA'S FACTUAL ALLEGATIONS

151.   Plaintiff Ahuja opened an account with the Bank in 2017.

152.   On February 7, 2022, Plaintiff Ahuja misplaced her cell phone in her apartment complex while doing laundry.

153.   When Plaintiff Ahuja found her phone, she received emails indicating that she had sent $3,500 in two transfers through Zelle from her Bank of America account.

154.   Plaintiff Ahuja never authorized such a transfer of funds. Plaintiff Ahuja also did not, and does not, know the identity of the recipients.

155.   Thereafter, Plaintiff Ahuja received a call from a person named "Ryan" who indicated that if she wanted her money back she would have to go to a store and engage in "cryptocurrency transactions."

156.   That same day, Plaintiff Ahuja immediately filed a police report with the Los Angeles Police Department and submitted a dispute to the Bank.

157.   Plaintiff Ahuja provided the Bank with a copy of the police report. She informed the Bank that the transactions were fraudulent and unauthorized because that she did not possess the phone at the time of the transactions. The fraudulent transactions were initiated by a third party from her phone.

158.   After calling the Bank, Plaintiff Ahuja was transferred to a representative for Zelle who, after receiving Plaintiff Ahuja's report of the error and explanation of the two unauthorized charges, informed her that she would not receive a refund.

159.   The Bank itself also denied her claim in a letter dated February 18, 2022, despite the detailed dispute filed by Plaintiff Ahuja and the Bank's prior knowledge of scams involving the Zelle mobile application.[45]

160.   The Bank's letter stated it was denying Plaintiff Ahuja's claim because the transaction was completed using a device that is "consistent with previous account activity" and that "an authentication code [was] sent to a valid phone number."[46]

161.   Other Bank records show, however, that the disputed transactions were objectively inconsistent with Plaintiff Ahuja's prior account use, and prior Zelle transaction history, as discussed above.

162.   Plaintiff Ahuja called the Bank and asked them to reconsider the denial and to recover the funds that were transferred from her account without her authorization. Plaintiff Ahuja even provided a copy of the police report to the Bank on or about February 22, 2022.

163.   On March 11, 2022, the Bank sent a letter to Plaintiff Ahuja stating that: "[w]e completed a re-evaluation of your claim and unfortunately, we're unable to credit your account."[47]

164.   On information and belief, the Bank did not review or consider the police report and Plaintiff Ahuja's prior transactions, nor did the Bank take any further

---

[45] BOFA-ZELLE-TRISTAN_00015894–901, at 00015901.
[46] *Id.*
[47] BOFA-ZELLE-TRISTAN_00015894–901, at 00015898.

steps to investigate, e.g., by investigating account activity of "Jiana Basconcillo."

165.   Even though Plaintiff Ahuja did not authorize any such transfer of funds from her account, the Bank would still not approve her claim because it opined: (i) "[o]ur investigation found that the transaction in question was completed using a device that is consistent with previous valid account activity"; (ii) "[o]ur investigation found that the transaction in question was validated using an authentication code sent to a valid phone number belonging to a signer on the account"; and (iii) "[o]ur investigation found that the transaction in question was confirmed by you via (SMS/MMS) text message response or speaking directly with Fraud Detection employee."[48]

166.   This boilerplate letter failed to explain (1) how the device use was consistent with previous valid account activity; (2) the phone number that the Bank sent an authentication code to; and (3) the phone number from which the Bank received a text message response or phone call from. Nor does the boilerplate letter provide any reasonable explanation how its "investigation" considered the facts and circumstances of Plaintiff Ahuja's situation—a phone that was misplaced, and then used by a fraudster to initiate unauthorized transactions.

167.   Additionally, the Bank's boilerplate letter did not identify the specific records in the Bank's possession that it reviewed in denying Plaintiff Ahuja's claim. There is no reference to the Bank reviewing Plaintiff Ahuja's monthly account statements or prior Zelle transactions. And to the extent the Bank reviewed such records, the Bank failed to explain how these records support its conclusion that Plaintiff Ahuja approved the transaction.

168.   This response fails to address circumstances of accountholders such as Plaintiff Ahuja, whose access device was stolen by fraudsters, because when fraudsters obtain the access device they can simply initiate the fraudulent transactions. The Bank's "investigation" in such circumstances is, by design,

---

[48] *Id.*

1    insufficient and improper.

2    169.   Like other customers who have had their accounts debited (and in some cases

3    drained) by imposters and scam artists, the Bank denied Plaintiff Ahuja's claim and

4    request for reversal of the unauthorized transaction(s), stating that these victims had

5    authorized the payments and were responsible for the loss.

6    170.   Ultimately, the Bank has not reimbursed Plaintiff Ahuja for her loss.

7                    **PLAINTIFF MYERS' FACTUAL ALLEGATIONS**

8    171.   Plaintiff Myers opened an account with the Bank on April 1, 2019.

9    172.   On or about April 2022, Plaintiff Myers noticed a fraudulent charge on his

10   credit card from Amazon.com. He proceeded to conduct a Google search for

11   Amazon's customer service line. He then called and spoke to a representative who

12   advised him to download an app on his phone that would allow the representative to

13   remotely review his account and refund the charge.

14   173.   Unbeknownst to Plaintiff Myers, an elderly 74-year-old, this number was a

15   fraudulent line, and the representative he spoke to was a fraudster.

16   174.   After downloading the app, Plaintiff Myers received a text message with

17   codes and the fraudster asked Plaintiff Myers to share them in order to continue with

18   the refund process.

19   175.   By downloading the app, and unbeknownst to Plaintiff Myers at the time, this

20   gave the fraudster the ability to view a live "mirror" of the phone while Plaintiff

21   Myers talked to the fraudster over the phone.

22   176.   On or about April 26, 2022, the fraudster tricked Plaintiff Myers into

23   transferring $1,709 in five separate transactions from Plaintiff Myers' personal bank

24   accounts using the Zelle EFT service.

25   177.   The same day, Plaintiff Myers called the Bank and spoke to a representative,

26   to report the five errors on his account and to notify them of the fraudulent

27   transactions. The Bank representative told him the Bank was informed of his

28   problem happening with other customers but that there was nothing they could do.

178.   On May 3, 2022, the Bank contacted Plaintiff Myers over the phone to inform him that the Bank had completed its investigation and determined that no error occurred. The Bank relied on conclusory terms of a Claim Denial form when issuing its denial.

179.   The Bank did not send Plaintiff Myers a written explanation of its findings when it contacted him on May 3, 2022.

180.   On May 19, 2022, the Bank sent Plaintiff Myers a letter denying his claim.[49] The letter stated the Bank "confirmed that the transfer posted to the account you requested."[50] Further, the letter stated "[s]ince we completed the transfer(s) according to the instructions you provided us, no error occurred. Based on this, your account won't be credited."[51] Despite the Bank representative's statements to Plaintiff Myers, the Bank acknowledged that Plaintiff Myers was a potential victim of a scam.[52]

181.   This boilerplate letter failed to explain how the Bank confirmed that the transfers posted to the account as Plaintiff Myers requested. Instead, the letter opaquely states the Bank "completed the transfer(s) according to the instructions you provided us."[53]

182.   Additionally, the Bank's boilerplate letter did not identify the specific records in the Bank's possession that it reviewed in denying Plaintiff Myers' claim. And to the extent the Bank referenced Plaintiff Myers' account history and monthly account statements, the Bank failed to explain how these records support its conclusion that Plaintiff Myers' approved the transactions.

183.   Other Bank documents confirm that the transactions Plaintiff Myers' disputed as fraudulent were, in fact, unauthorized. Plaintiff Myers' account statements show

---

[49] BOFA-ZELLE-TRISTAN_00015909.
[50] *Id.*
[51] *Id.* (emphasis added).
[52] BOFA-ZELLE-TRISTAN_00015880–83, at 00015882.
[53] BOFA-ZELLE-TRISTAN_00015909.

he had never previously sent money via Zelle to the third-party fraudster, whose receipient name in the transfer was labelled "Patrick."

184.    Moreover, the letter the Bank sent on May 19, 2022, fell outside the 10-day period in which the Bank was required to provide a written explanation of its findings.

185.    The Bank has not reimbursed Plaintiff Myers for his loss.

**CLASS ALLEGATIONS**

186.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

187.    Plaintiffs are members of and seek to represent a Nationwide Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), defined as:

> All Bank of America customers within the United States whose bank accounts with Bank of America were debited via one or more transactions using the Bank of America and/or Zelle mobile application and were not permanently credited by Defendant in full within forty-five (45) days of a dispute by the customer and/or their authorized representative concerning the transaction(s).

188.    Plaintiff Tristan and Plaintiff Ahuja are members of and seek to represent a California Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), defined as:

> All Bank of America customers residing in California whose bank accounts with Bank of America were debited via one or more transactions using the Bank of America and/or Zelle mobile application and were not permanently credited by Defendant in full within forty-five (45) days of a dispute by the customer and/or their authorized representative concerning the transaction(s).

189.    Excluded from the Nationwide Class and Sub-Class are Bank of America's officers, directors, and employees; any entity in which Bank of America has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Bank of America. Further excluded from the Nationwide Class and Sub-Class are members of the judiciary to whom this case is assigned, their

families, and members of their staff.

190. Plaintiffs reserve the right to modify the proposed class and sub-class definitions, including but not limited to expanding the class to protect additional individuals and to assert additional sub-classes.

191. The proposed Nationwide Class and Sub-Class meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and/or (b)(3).

192. <u>Numerosity</u>: The members of the Nationwide Class and Sub-Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, on information and belief, the Nationwide Class and Sub-Class consists of thousands of individuals nationwide.

193. <u>Commonality</u>: There are questions of law and fact common to the Nationwide Class and Sub-Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.    Whether Plaintiffs and the Class Members lost money that was transferred from their account via Zelle;

    b.    Whether Plaintiffs and the Class Members were customers of the Bank at the time of the fraudulent or unauthorized transactions;

    c.    Whether Bank of America violated EFTA by failing to adequately investigate the error reporting of fraudulent or unauthorized transactions of Plaintiffs and the Class Members;

    d.    Whether Bank of America violated EFTA by failing to correct errors on the accounts of Plaintiffs and the Class Members within ten (10) days of the transaction being disputed without provisionally crediting Plaintiffs' or Class Members' accounts;

    e.    Whether Bank of America violated EFTA by failing to correct errors on the accounts of Plaintiffs and the Class Members within forty-five (45) days of the transaction being disputed and not provisionally

crediting Class Members' accounts;

f.   Whether Bank of America violated EFTA by failing to timely issue written explanations of its findings to Plaintiffs and the Class Members;

g.   Whether Plaintiffs and the Class Members are entitled to maximum statutory damages, costs, and fees under EFTA;

h.   California Sub-Class: Whether the conduct of the Bank was "unlawful" as that term is defined in California's Unfair Competition Law ("UCL");

i.   California Sub-Class: Whether the conduct of Bank of America was "unfair" as that term is defined in the UCL;

j.   Whether Bank of America breached its contract; and

k.   Whether Plaintiffs and the Classes are entitled to injunctive relief, including public injunctive relief.

194.   <u>Typicality</u>: Plaintiffs' claims are typical of those of other members of the Nationwide Class and Sub-Class because Plaintiffs were victims of the Zelle scam by a third party who caused a withdrawal of funds from their BOA account to occur through the Bank/Zelle mobile application. After reporting the error(s) and disputing the unauthorized transaction(s), Plaintiffs were informed by Bank of America that the unauthorized transaction(s) would ultimately not be reversed.

195.   <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent and protect the interests of members of the Nationwide Class and Sub-Class. Plaintiffs' Counsel are competent and experienced in litigating consumer class actions.

196.   <u>Predominance</u>: Bank of America has engaged in a common course of conduct toward Plaintiffs as well as the members of the Nationwide Class and Sub-Class, in that all were induced into allowing a third party to make unauthorized withdrawals on their BOA accounts using Zelle. The common issues arising from Bank of

America's conduct affecting members of the Nationwide Class and Sub-Class set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

197.   <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most members of the Nationwide Class and Sub-Class would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual members of the Nationwide Class and Sub-Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Nationwide Class and Sub-Class, which would establish incompatible standards of conduct for Bank of America. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

198.   Bank of America has acted on grounds that apply generally to the Nationwide Class and Sub-Class, so that class certification is appropriate.

199.   All Members of the proposed Nationwide Class and Sub-Class are readily ascertainable. Bank of America has access to consumer reporting of errors and fraudulent and/or unauthorized transactions on their books and records. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

200.   <u>The Proposed Class and Sub-Class satisfy the prerequisties for injunctive relief.</u> Bank of America has acted or refused to act on grounds generally applicable to the Nationwide Class and Sub-Class, thereby making final injunctive and equitable relief appropriate with respect to the Class as a whole.

201.   Plaintiffs remain interested in using Zelle to transfer account funds in the future due to the convenience; however, there is no way for Plaintiffs and the

Nationwide Class and Sub-Classs to know whether or when Bank of America will cease summarily investigating and denying reported fraudulent or unauthorized Zelle transactions and unlawfully withholding provisional credits. Additionally, without an injunction, Plaintiffs and the Nationwide Class and Sub-Classs cannot be assured that Bank of America will cease their continuing failure to honor proper and timely consumer disputes concerning unauthorized Zelle transactions in the future.

202.  Specifically, Bank of America should be ordered to conduct in good faith, reasonable investigations into consumer disputes relating to transcations utilizing the Zelle service, including but not limited to due consideration of police reports as well as prior transaction history using Zelle such as amount and frequency of transactions and payee information.

203.  Similarly, Bank of America should be ordered to adopt a policy and practice that takes into consideration the frequency and nature of disputed consumer Zelle transactions based on repeated disputes concerning a given payee.

204.  Bank of America's ongoing and systemic practices makes injunctive relief with respect to the Nationwide Class and Sub-Class appropriate, because without this relief there is no incentive for Bank of America to correct their conduct that risks substantial harm to consumers, especially due to increasing fraud using the Zelle service.

205.  <u>Notice</u>: Plaintiffs anticipate providing direct notice to the members of the Nationwide Class and Sub-Class for purposes of class certification, via U.S. Mail and/or email, based upon Bank of America's records, Bank of America's agents' records and/or records of EWS.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT INCLUDING BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

**(Asserted on Behalf of All Plaintiffs and the Nationwide Class, and the California Sub-Class Against Defendant Bank of America)**

206. Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

207. This cause of action is asserted on behalf of all Plaintiffs. But as to Plaintiff Tristan, per the Court's Order, she only asserts a breach of the covenant of good faith and fair dealing.

208. Plaintiffs and members of the Nationwide Class contracted with the Bank for checking account services, as embodied in the Agreement.

209. The Bank breached the terms of its contract with consumers when, as described herein, the Bank failed to refund fraudulent or unauthorized transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service.

210. Further, under the law of each of the states where the Bank does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains the Bank's discretion to abuse self-granted contractual powers.

211. This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

212. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

213.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

214.   The Bank breached the covenant of good faith and fair dealing when they failed to fairly investigate reported fraudulent transactions on the Zelle money transfer service, failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service, and adopted an unfair and unreasonable definition of the term "unauthorized transaction."

215.   Each of the Bank's actions were done in bad faith and were arbitrary and capricious.

216.   Plaintiffs and members of the Nationwide Class have performed all of the obligations imposed on them under the contract.

217.   Plaintiffs and members of the Nationwide Class have sustained monetary damages as a result of the Bank's breaches of the Agreement and covenant of good faith and fair dealing.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT ("EFTA"),**
**15 U.S.C. § 1693 *ET SEQ.***

**(On Behalf of Plaintiffs Ahuja and Myers and the National Class Against Defendant Bank of America)**

218.   Plaintiff Ahuja and Plaintiff Myers reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

219.   EFTA and Regulation E "appl[y] to any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account." 12 C.F.R. § 1005.3(a).

220. Zelle transactions initiated by third party fraudsters are transactions subject to the requirements of 12 C.F.R. §1005.3(a).

221. Financial institutions have error resolution obligations pursuant to Regulation E in the event that a consumer notifies the financial institution of an error. 12 C.F.R. § 1005.11.

222. The Bank is a financial institution. 12 C.F.R. § 1005.2(i).

223. Plaintiff Ahuja notified the Bank of an error and the amount of the error.

224. Plaintiff Myers notified the Bank of an error and the amount of the error.

225. The Bank failed to provisionally credit Plaintiff Ahuja's and Plaintiff Myers' accounts. *See* 15 U.S.C. § 1693f(a); 12 C.F.R. § 205.11(c)(2); *supra* ¶¶ 80-92.

226. The Bank failed to issue written findings to Plaintiff Myers' within ten (10) days of him reporting his disputed claim. *See* 15 U.S.C. § 1693f(a)(3); 12 C.F.R. § 205.11(c)(1); *supra* ¶¶ 93-94.

227. The Bank failed to comply with its EFTA and Regulation E duties to properly investigate reported claims of error. *See* 15 U.S.C. § 1693f(c); 12 C.F.R. § 205.11(c)(4); *supra* ¶¶ 95-119.

228. Financial institutions are required to investigate errors where, "within sixty days after having transmitted to a consumer pursuant to [15 U.S.C. §] 1693d(a), (c), or (d) of this title or notification pursuant to [15 U.S.C. §] 1693(d)(b) of this title," the financial institutions "receive[] oral or written notice in which the consumer[:] (1) sets forth or otherwise enables the financial institution to identify the name and the account number of the consumer; (2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to [15 U.S.C. §] 1693d(b) of this title, the consumer's account, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred." 15 U.S.C. § 1693f(a).

229. In summarily investigating and then denying Plainiff Ahuja and Plaintiff Myers' claims of error with its boilerplate letters, the Bank failed to consider, *inter*

*alia*, whether the amount of each electronic fund transfer was consistent with prior use, whether the number of electronic fund transfers initiated in one day was consistent with prior use, and whether the Plaintiff had previously transferred money to that receipient.

230.   Upon information and belief, the Bank knowingly and willfully failed to fulfill its obligations to investigate Plaintiffs' unauthorized transactions and instead summarily concluded that the transfers of funds via Zelle on accounts of Plaintiffs and Nationwide Class Members were "not in error when such conclusion[s] could not reasonably have been drawn from the evidence available to the financial institution[s] at the time of [the] investigation." 15 U.S.C. §1693f€(2).

231.   Upon information and belief, the Bank intentionally determined that the unwanted transfer of funds via Zelle on accounts of Plaintiffs and Nationwide Class Members were not in error due to, at least in part, the Bank's financial self-interest as a stakeholder in Zelle and to avoid its liability to Plaintiffs and other Class members for the unauthorized transfers pursuant to Regulation E.

232.   The Bank refused to reverse or refund funds to Plaintiff Ahuja after it deemed its investigation concluded.

233.   The Bank refused to reverse or refund funds to Plaintiff Myers after it deemed its investigation concluded.

234.   Accordingly, the Bank failed to comply with its error resolution and reimbursement obligations to Plaintiffs under EFTA, 15 § U.S.C. 1693f–1693g, and Regulation E. *See* 12 C.F.R. § 1005.11; *supra* ¶¶ 117-121.

235.   As a result of the Bank's refusal to reverse or refund funds to Plaintiffs Ahuja and Myers, Plaintiffs Ahuja and Myers are liable for unauthorized electronic fund transfers in amounts greater than $50, in violation of 15 U.S.C. § 1693g(a).

236.   Upon information and belief, the Bank's non-compliance with its error resolution and reimbursement obligations is due, at least in part, to the Bank's financial self-interest as a stakeholder in EWS.

237.   The Bank's failure to comply with its provisional credit, investigation, error resolution and reimbursement obligations gives rise to separate, actionable harms to Plaintiffs Ahuja and Myers and to similarly affected Nationwide Class Members.

238.   As such, Plaintiffs and Nationwide Class Members are each entitled to (i) actual damages; (ii) treble damages; (iii) the lesser of $500,000.00 or one percent (1%) of the net worth of the Bank; and (iv) reasonable attorneys' fees and costs. 15 U.S.C. §§ 1693f(e)(2), 1693m(a)(2)(B)–(3).

### THIRD CAUSE OF ACTION
### CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),
### CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*

**(On Behalf of Plaintiffs Tristan and Ahuja and California Sub-Class Against Defendant Bank of America)**

239.   Plaintiff Tristan and Plaintiff Ahuja reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

240.   The UCL defines "unfair competition" to include any "unlawful, unfair or fraudulent" business act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

241.   The UCL imposes strict liability. Plaintiffs need not prove that the Bank intentionally or negligently engaged in unlawful or unfair business practices—but only that such practices occurred.

### *"Unlawful" Prong*

242.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

243.   The Bank's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of EFTA as described in the Second Cause of Action above.

244.   The violation of any law constitutes as "unlawful" business practice under the UCL.

245.   These acts and practices alleged were intended to or did result in violations of EFTA.

246.   The Bank has denied and will continue to unlawfully deny the transaction disputes of Plaintiff Tristan and Plaintiff Ahuja, the California Sub-Class, and the public by claiming that said disputed transactions are "authorized," even though said transactions are actually "unauthorized," as that term is defined by EFTA and applicable regulations. Consequently, the practices of the bank constitutes unlawful business practices within the meaning of the UCL, as they violate EFTA as described below.

247.   Plaintiff Tristan and Plaintiff Ahuja remain Bank accountholders, remain interested in using Zelle to transfer account funds in the future, and have an interest in the Bank provisionally crediting disputed Zelle money transfers, properly investigating unauthorized Zelle money tranfers, and reversing past and any future unauthorized Zelle transfers on their accounts maintained by the Bank while the Bank continues to allow Zelle transfers. Additionally, Plaintiff Tristan and Ahuja have maintained the BOA app on their phones and regularly use it. The Zelle money transfer tool is an integrated feature of the BOA app and not removeable by the BOA customer from the BOA app.

248.   Pursuant to the UCL, Plaintiff Tristan and Plaintiff Ahuja and the California Sub-Class are entitled to prospective preliminary and permanent injunctive relief and an order requiring the Bank to cease this unlawful competition and for corrective action in terms of the Bank's policies and procedures pertaining to Zelle transactions as it concerns i) provisional credits to customer accounts during the investigation period, ii) investigation of unauthorized money tranfers, and iii) reimbursements to consumers for unauthorized Zelle transactions, to benefit the California public who use Zelle and/or who may use Zelle in the future.

249.   Without a prospective injunction, Plaintiff Tristan and Plaintiff Ahuja cannot be confident that the Bank will comply with its EFTA obligations as described above

in relation to unauthorized Zelle money transfers going forward to protect California consumers, including Plaintiff Tristan and Plaintiff Ahuja, especially in light of the substantial and continued threat of fraud associated with the Zelle money transfer service.

### *"Unfair" Prong*

250.   A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

251.   The Bank's actions constitute "unfair" business practices because, as alleged above, it intentionally declines to reverse fraudulent charges on the accounts of Plaintiffs Tristan and Ahuja and California Sub-Class Members, often fails to provisionally credit accountholders for disputed Zelle money transfers, and frequently fails to conduct a proper investigation into fraudulent Zelle money transfer, despite the Bank's awareness of creditable evidence of the fraudulent charges, all in an effort to save EWS and the Bank money by not reimbursing consumers.

252.   Additionally, the Bank's actions constitute "unfair" business practices because, on information and belief, the Bank summarily denies disputed Zelle money transfers in many instances where EWS has not flagged for the Bank the transaction as fraudulent, and the Bank also uses boilerplate denial letters for customer disputed Zelle money transfers.

253.   The harm to Plaintiff Tristan and Plaintiff Ahuja and California Sub-Class Members grossly outweighs the utility of the Bank's practices with regard to fraudulent Zelle money transfers, as there is little to no utility other than to protect the bottom line of the Bank and EWS. Additionally, there is little to no utility to the

Bank's practices in light of the continued and substantial risk of fraud relating to the Zelle service, including scams known to the Bank.

254.   Plaintiff Tristan and Plaintiff Ahuja remain Bank accountholders, remain interested in using Zelle to transfer account funds in the future, and have an interest in the Bank provisionally crediting disputed Zelle money transfers, properly investigated unauthorized Zelle money tranfers, and reversal past and any future unauthorized Zelle transfers on their accounts maintained by the Bank while the Bank continues to allow Zelle transfers. Additionally, Plaintiff Tristan and Ahuja have maintained the BOA app on their phone and regularly use it. The Zelle money transfer tool is an integrated feature of the BOA app and not removeable by the BOA customer from the BOA app.

255.   Pursuant to the UCL, Plaintiff Tristan and Plaintiff Ahuja and the California Sub-Class are entitled to prospective preliminary and permanent injunctive relief and an order requiring the Bank to cease this unfair competition and for corrective action in terms of the Bank's policies and procedures pertaining to Zelle transactions as it concerns i) provisional credits to customer accounts during the investigation period, ii) investigation of unauthorized money tranfers and dispute response letters, and iii) reimbursements to consumers for unauthorized Zelle transactions, to benefit the California public who use and/or may use Zelle in the future.

256.   Without a prospective injunction, Plaintiff Tristan and Plaintiff Ahuja cannot be confident that the Bank will correct its policies and practices in relation to unauthorized Zelle money transfers to protect California consumers, including Plaintiff Tristan and Plaintiff Ahuja, especially in light of the substantial and continued threat of fraud associated with the Zelle money transfer service.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against the Bank as follows:

- Class certification of this action;

- Appointment of Plaintiffs as Class Representatives;
- Appointment of Plaintiffs' attorneys as Class Counsel;
- An award of actual damages, in an amount to be determined at trial;
- An award of treble damages against the Bank pursuant to the EFTA;
- An award of the lesser of $500,000.00 or one percent (1%) of the net worth of the Bank;
- Injunctive and other equitable relief against the Bank as necessary to protect the interests of Plaintiffs and other Class and Sub-Class Members, and an order prohibiting the Bank from engaging in unlawful and/or unfair acts described above, including public injunctive relief;
- An order declaring the Bank's conduct as unlawful;
- Costs of Suit;
- Pre and post-judgment interest;
- An award of reasonable attorneys' fees pursuant to, *inter alia*, 15 U.S.C. § 1693m(a)(2)(B)–(3), Cal. Civ. Proc. Code § 1021.5, and the common fund doctrine; and
- Any other relief the Court may deem just and proper, including interest.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a jury trial on all claims so triable.

Dated: November 22, 2023                    Respectfully submitted,

**EDELSBERG LAW, P.A.**

By: */s/ Scott Edelsberg*
Scott Edelsberg (CA Bar # 330090)
scott@edelsberglaw.com
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Tel: 305-975-3320

*ATTORNEY FOR PLAINTIFFS*

**ADDITIONAL PLAINTIFFS' COUNSEL**

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Telephone: (800) 400-6808

**KAZEROUNI LAW GROUP, APC**
Ross H. Schmierer, Esq. (*pro hac vice forthcoming*)
ross@kazlg.com
3000 Atrium Way, Suite 200
Mt. Laurel, NJ 08057
Telephone: (732) 588-8688

**KAZEROUNI LAW GROUP, APC**
Pamela E. Prescott, Esq. (328243)
pamela@kazlg.com
Gil Melili, Esq. (SBN: 337116)
gil@kazlg.com
245 Fischer Avenue Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808

**KELLER ROHRBACK L.L.P.**
Laura R. Gerber (*pro hac vice*)
lgerber@kellerrohrback.com
Derek W. Loeser (*pro hac vice*)
dloeser@kellerrohrback.com
Nathan L. Nanfelt (*pro hac vice*)
nnanfelt@kellerrohrback.com
Chris N. Ryder (*pro hac vice*)
cryder@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, Washington 98122
Telephone: (206) 623-1900

1

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)

2

jkaliel@kalielpllc.com

3

1100 15th Street NW, 4th Floor
Washington, D.C. 20005

4

Telephone: (202) 350-4783

5

6

**SHAMIS & GENTILE, P.A.**
Edwin E. Elliott (*pro hac vice*)

7

edwine@shamisgentile.com

8

14 NE 1st Avenue, Suite 705
Miami, FL 33132

9

Telephone: (305) 479-2299

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28